Ryan P. Atkinson, #10673
Scarlet R. Smith, #15024
R. Jesse Davis, #16032
STRONG & HANNI
102 South 200 East, Suite 800
Salt Lake City, Utah 84111
Telephone: (801) 532-7080
Facsimile: (801) 596-1508
ratkinson@strongandhanni.com
ssmith@strongandhanni.com
jdavis@gmail.com

*Attorney for the Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| VZZR INC., a Delaware corporation, dba in Utah as PUBLISHER ARTS; VIBEONIX, LLC a Utah limited liability company; ZERO LIMITS VENTURES, LLC a Virginia limited liability company; WINGS MEDIA LLC, a Delaware limited liability company, d/b/a PODOPOLO; SELU TECHNOLOGIES, INC., a Utah corporation; ELITE BUSINESS SOLUTIONS, LLC a Utah LLC; KEREON INTELLIGENCE, L.L.C., a Utah limited liability company; TRACTUSMED, LLC, a Utah limited liability company; PROGENITOR MDX Inc. a Utah corporation; and PERFECT ORDER EXPERIENCE, LLC a Utah limited liability company;<br><br>Plaintiffs<br><br>v | **COMPLAINT**<br><br>Case No. 2:22-cv-00154-CMR<br><br><br>District Judge:<br><br>Magistrate Judge: Cecilia M. Romero<br><br><br>(JURY TRIAL DEMANDED) |

1

TALLCASTLE, LLC, a Utah limited
liability company; TALLCASTLE
VENTURE DEBT, a dba of TALLCASTLE
LLC; TALLCASTLE INTERNATIONAL
SIF, a dba of TALLCASTLE LLC;
CLARITY PARTNERS LLC, a Utah limited
liability company; CARSON PAYNE, an
individual; MARK  SHURTLEFF, an
individual; ED EKSTROM, an individual;
DORADO MATTA and CAMBEST, P.C., a
Pennsylvania professional company; GARY
MATTA, an individual; D2D FINANCIAL,
an Arizona limited liability company;
ALLIANCE FINANCIAL NETWORK,
INC., a Colorado corporation; THE ESTATE
OF LARRY LIPMAN; JOHN DOES 1
through 10, individuals; and ROE ENTITIES
I through X, business entities.

Defendants.

The above-named Plaintiffs hereby appear through counsel and complain of the above-named Defendants as follows.

## PARTIES, JURISDICTION, AND VENUE

### Plaintiffs

1.      Plaintiff VzzR INC., a Delaware C corporation, dba in Utah as Publisher Arts ("Publisher Arts"), with its principal place of business located in Salt Lake County, State of Utah.

2.      Plaintiff  Vibeonix, LLC ("Vibeonix") is  a Utah limited liability company, with its principal place of business located in Salt Lake County, State of Utah.

3.      Plaintiff  Zero Limits Ventures, LLC ("Zero Limits") is a Delaware limited liability company with its principal place of business located in Salt Lake County, State of Utah.

4.      Plaintiff  Wings Media LLC d/b/a/ Podopolo ("Podopolo") is a Utah limited liability company with its principal place of business located in Salt Lake County, State of Utah.

2

5.      Plaintiff Selu Technologies, Inc. ("Selu") is a Utah corporation with its principal place of business located in Salt Lake County, State of Utah.

6.      Plaintiff Elite Business Solutions, LLC ("Elite Business Solutions") is a Utah limited liability company with its principal place of business located in Salt Lake County, State of Utah.

7.      Plaintiff Kareon Intelligence, L.L.C., ("Kareon") is a Utah limited liability company with its principal place of business located in Salt Lake County, State of Utah.

8.      Plaintiff Tractusmed, LLC, ("Tractusmed") is a Utah limited liability company with its principal place of business located in Salt Lake County, State of Utah.

9.      Plaintiff Progenitor MDX Inc. ("Progenitor") is a Utah corporation with its principal place of business located in Salt Lake County, State of Utah.

10.      Plaintiff Perfect Order Experience, LLC, ("Perfect Order") is a Utah limited liability company with its principal place of business located in Salt Lake County, State of Utah.

## TallCastle Defendants

### (Collectively referred to herein as "TallCastle")

11.      Defendant TallCastle, LLC is a Utah limited liability company with its principal place of business located in Salt Lake County, State of Utah.

12.      Defendant TallCastle Venture Debt, upon information and belief is a DBA of TallCastle, LLC.

13.      Defendant TallCastle International SIF, upon information and belief is a DBA of TallCastle, LLC.

14.      Personal jurisdiction is appropriate over these defendants because they conducted substantial business in Utah and the claims alleged herein arose from these Defendants' acts

directed toward Utah, including its contract with the individual Plaintiffs related to the subject matter of the action.

**Other Defendants**

15.    Defendant Clarity Partners ("Clarity") is a Utah limited liability company with its principal place of business located in Salt Lake County, State of Utah, who upon information and belief may be an alter ego of TallCastle. Personal jurisdiction is appropriate over this defendant because it conducted substantial business in Utah and the claims alleged herein arose from this Defendant's acts were directed toward Utah, including collecting and later transferring the Plaintiffs' funds, and it's internal dealings with TallCastle which relates to the subject matter of the action.

16.    Defendant Carson Payne ("Payne") is an individual and upon information and belief resides in Salt Lake County, Utah, and is a principal of TallCastle and Clarity. Personal jurisdiction is appropriate over this defendant because it conducted substantial business in Utah and the claims alleged herein arose from this Defendant's acts were directed toward Utah, including collecting and transferring the Plaintiffs' funds, and it's internal dealings with TallCastle and Clarity which relates to the subject matter of the action, and his own personal gains that relate to the wrongdoings of himself and the other Defendants.

17.    Defendant Mark Shurtleff ("Shurtleff") is an individual and upon information and belief resides in Salt Lake County, Utah, and is a principal of TallCastle and Clarity. Personal jurisdiction is appropriate over this defendant because it conducted substantial business in Utah and the claims alleged herein arose from this Defendant's acts were directed toward Utah, including collecting and transferring the Plaintiffs' funds, and it's internal dealings with TallCastle

and Clarity which relates to the subject matter of the action, and his own personal gains that relate to the wrongdoings of himself and the other Defendants.

18.    Defendant Ed Ekstrom ("Ekstrom") is an individual who upon information and belief resides in Salt Lake County, Utah, and is a principal of TallCastle and Clarity.

19.    Dorado Matta and Cambest, P.C. ("DMC") is a Pennsylvania professional company with its principal place of business located in Allegheny County, Pennsylvania. Personal jurisdiction is appropriate over this defendant because it conducted substantial business in Utah including contracting with TallCastle and/or Clarity to secure and distribute Plaintiffs' funds.

20.    Gary Matta ("Matta") is an individual who upon information and belief resides in Allegheny County, Pennsylvania. Personal jurisdiction is appropriate over this defendant because it conducted substantial business in Utah and the claims alleged herein arose from this Defendant's acts were directed toward Utah, including collecting and transferring the Plaintiffs' funds, and it's internal dealings with TallCastle and Clarity which relates to the subject matter of the action, and his own personal gains that relate to the wrongdoings of himself and the other Defendants.

21.    Defendant D2D Financial, LLC, ("D2D") is an Arizona limited liability Company with its principal place of business located in Maricopa County, Arizona.   Personal jurisdiction is appropriate over this defendant because it conducted substantial business in Utah including contracting with TallCastle and/or Clarity to secure and distribute Plaintiffs' funds.

22.    Defendant Alliance Financial Network Inc. ("Alliance") is a Colorado corporation with its principal place of business located in Denver Colorado. Personal jurisdiction is appropriate over this defendant because it conducted substantial business in Utah including contracting with TallCastle and/or Clarity to secure and distribute Plaintiffs' funds.

23.     Defendant the Estate of Larry Lipman stands in place of the decedent Larry Lipman ("Lipman") who was the CEO of Alliance, and before his passing resided in Denver Colorado. Personal jurisdiction is appropriate over this defendant because it conducted substantial business in Utah and the claims alleged herein arose from this Defendant's acts were directed toward Utah, including collecting and transferring the Plaintiffs' funds, and it's internal dealings with TallCastle and Clarity which relates to the subject matter of the action, and his own personal gains that relate to the wrongdoings of himself and the other Defendants.

24.     Defendants JOHN DOES 1 through 10 and ROE ENTITIES I through X are individuals and business entities the identity of which is not currently known to the Plaintiffs, but who contributed to the Plaintiffs' losses which are the subject of this Complaint. Plaintiffs are actively investigating the matter and anticipate that these parties will be added when they are discovered.

## JURISDICTION AND VENUE

25.     Pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa, this Court has original subject matter jurisdiction over the claims alleged in this action arising under the laws of the United States, including specifically the Plaintiffs' claims asserted under 15 U.S.C. § 78j(b) (including S.E.C. Rule 10b-5 promulgated thereunder and codified at 17 C.F.R. §240.10b-5), 15 U.S.C. §78t(a), and 15 U.S.C. §77l.

26.     The Court has supplemental jurisdiction over the claims asserted herein under state law pursuant to 28 U.S.C. § 1367 because such claims are so related to the claims arising under the laws of the United States that they form part of the same case or controversy under Article III of the United States Constitution.

27.     Venue is appropriate in this forum pursuant to 28 U.S.C. § 1391 (b)(2) and 15 U.S.C. § 78aa.

## FACTUAL BACKGROUND

28.     Defendants Payne, Shurtleff and Ekstrom founded TallCastle and its related entities.

29.     TallCastle advertises themselves as a Private Equity Company and targets smaller to lower middle market companies, for lending opportunities.

30.     These companies typically have real products, customers, revenues, cash flow, attractive and growing markets, and annual revenues between $5 and $50 million.

31.      Often, these companies are not growing as fast as they could because they have encountered one or more challenges that might include a lack of financial capital, an inability to expand geographically, an aging management, a lack of vision, inefficient marketing resources, or other critical variables.

32.     TallCastle advertises that, by adding capital, management talent and outside assistance, TallCastle can "unlock the inherent value in these companies, help them grow faster and increase their market value".

33.     TallCastle also advertises its corporate partners, explaining in its website that one of the most important differentiations between TallCastle and other PE firms is the makeup of our potential investors, and that TallCastle can attempt to arrange an investment from one of our investors directly into the company, giving each company a much deeper relationship and advantage in future products and markets.

34.     Beginning in 2020, TallCastle—through Payne, Ekstrom, and Shurtleff— reached out to multiple small businesses, including the Plaintiffs by advertising low interest rate loans, and a network of viable potential investors in these small businesses.

35.     During these discussions, TallCastle—through Payne, Ekstrom, and Shurtleff— made multiple misrepresentations:

36.     Zero Limits and Podopolo:

Payne began his discussions with Zero Limits and Podopolo, in October 2020. During these initial discussions Payne and Ekstrom met with Steve Little, (a principle of Podopolo and Zero Limits) and in the conversations, both Payne and Ekstrom told Mr. Little that all TallCastle needed to fund the loan was a small origination fee. This origination fee would be held escrow for a short period, whereafter an entity called Alliance, would then fund the loan. Payne explained that the purpose of the deposit was to "unlock" other funds, and that Zero Limits' and Podopolo's funds would remain in escrow until the later of 45 days, or the loan was funded. If no funding occurred, the companies would receive their full refund from the escrow, in addition to interest.  In an effort to persuade Mr. Little,  Payne and Ekstrom presented a legal opinion from Shurtleff Law Firm, PC dated October 1, 2020 (the "Shurtleff Letter"), wherein Shurtleff made representations that he had done due diligence on the lending vehicle, and  Alliance in particular. In the Shurtleff letter, Shurtleff stated that "it is my legal opinion that business partners, clients and investors can place full faith and trust in transacting business with [Alliance] and DMC's trust account."   Payne and Ekstrom repeatedly promised that the proceeds would not leave the escrow account unless the loans were funded, and that if the borrower ever requested their funds back after the 45 days, they would get it immediately. Each of these representations were false.

37.    Vibeonix:

In discussions with Vibeonix, Payne and Ekstrom had multiple conversation with Kristi Holt from Vibonix. Ms. Holt is a principle of Vibeonix.  The initial conversation took place in approximately October of 2020. Payne represented to Ms. Holt that the loan would function as a mortgage, all that was required was a down payment, and then the funds would be unlocked. Payne repeatedly reassured Ms. Holt that the funds were safe and that if no funding occurred, the Vibeonix would receive their full refund from the escrow, in addition to interest.  Ms. Hold was initially skeptical and requested more information. Payne sent over a redacted copy of an escrow agreement, but refused to disclose the names of the parties and never presented an executed copy.   Later in October, Payne presented the Shurtleff Letter to Ms. Holt, wherein Shurtleff made representations that he had done due diligence on the lending vehicle, and  Alliance in particular. In the Shurtleff letter, Shurtleff stated that "it is my legal opinion that business partners, clients and investors can place full faith and trust in transacting business with [Alliance] and DMC's trust account."   Payne repeatedly promised that the proceeds would not leave the escrow account unless the loans were funded, and that if the borrower ever requested their funds back after the 45 days, they would get it immediately. Each of these representations were false.

38.    Selu:

Ekstrom was introduced to Jake Hammock, a principle of Selu, through a mutual friend in the fall of 2020.   In October of 2020, Mr. Hammock sat down with Ekstrom and Payne. Ekstrom led the discussion and explained how the capital came from, and how it was meant to leverage assists in an effort to gain more capital.  Ekstrom told Mr. Hammock that due to the leverage of the deposit of fund, they were creating a negative interest rate for the banks, which would allow for more favorable terms for the borrowers.   Later in October, Payne presented the Shurtleff Letter to Ms.

Holt, wherein Shurtleff made representations that he had done due diligence on the lending vehicle, and Alliance in particular. In the Shurtleff letter, Shurtleff stated that "it is my legal opinion that business partners, clients and investors can place full faith and trust in transacting business with [Alliance] and DMC's trust account." Payne repeatedly promised that the proceeds would not leave the escrow account unless the loans were funded, and that if the borrower ever requested their funds back after the 45 days, they would get it immediately. Each of these representations were false. Selu relied on an angel investor to fund the initial deposit, and after the loan wasn't funded, Mr. Hammock reached out to Ekstrom, whereafter Mr. Ekstrom wrote Selu a check for $200,000 and but told him not to deposit it for a few because Ekstrom needed to move some money around. The next day Ekstrom called and said don't deposit it the money is all gone.

39.    Elite Business Solution:  Darren Olayan;

Upon information and belief, Payne began his discussions with Darren Olayan, a principle of Eliete Business Solutions, in October 2020. During these initial discussions, both Payne and Ekstrom told Mr. Olayan that all TallCastle needed to fund the loan was a small origination fee. This origination fee would be held in escrow for a short period, whereafter an entity called Alliance, would then fund the loan. Payne explained that the purpose of the deposit was to "unlock" other funds, and that Elite Business Solutions' funds would remain in escrow until the later of 45 days, or the loan was funded. If no funding occurred, the company would receive their full refund from the escrow, in addition to interest. In an effort to persuade Mr. Olayan, Payne and Ekstrom presented the Shurtleff Letter, wherein Shurtleff made representations that he had done due diligence on the lending vehicle, and Alliance in particular. In the Shurtleff letter, Shurtleff stated that "it is my legal opinion that business partners, clients and investors can place full faith and trust in transacting business with [Alliance] and DMC's trust account." Payne and Ekstrom repeatedly

promised that the proceeds would not leave the escrow account unless the loans were funded, and that if the borrower ever requested their funds back after the 45 days, they would get it immediately. Each of these representations were false.

40.    Kereon: Razanadraibe Hughes:

Upon information and belief, Payne began his discussions with Razanadraibe Hughes, a principle of Kereon, in October 2020. During these initial discussions, both Payne and Ekstrom told Mr. Hughes that all TallCastle needed to fund the loan was a small origination fee. This origination fee would be held in escrow for a short period, whereafter an entity called Alliance, would then fund the loan. Payne explained that the purpose of the deposit was to "unlock" other funds, and that Kereon's funds would remain in escrow until the later of 45 days, or the loan was funded. If no funding occurred, the company would receive their full refund from the escrow, in addition to interest.  In an effort to persuade Mr. Hughes,  Payne and Ekstrom presented the Shurtleff Letter, wherein Shurtleff made representations that he had done due diligence on the lending vehicle, and Alliance in particular. In the Shurtleff letter, Shurtleff stated that "it is my legal opinion that business partners, clients and investors can place full faith and trust in transacting business with [Alliance] and DMC's trust account."   Payne and Ekstrom repeatedly promised that the proceeds would not leave the escrow account unless the loans were funded, and that if the borrower ever requested their funds back after the 45 days, they would get it immediately. Each of these representations were false.

41.    Tractusmed: Richard Dick:

In July 2020, Ekstrom introduced Richard Dick, a principle of Tractusmed, into this sort of lending program.  Ekstrom informed Mr. Dick that he found a new vehicle where you would only need to pay 10% of the total loan value, and then they would get funded 9 times that amount, all while the

original funds were protected in escrow. Mr. Dick was initially convinced that this sort of deal was too good to be true, but then Ekstrom provided the Shurtleff letter wherein Shurtleff made representations that he had done due diligence on the lending vehicle, and  Alliance in particular. In the Shurtleff letter, Shurtleff stated that "it is my legal opinion that business partners, clients and investors can place full faith and trust in transacting business with [Alliance] and DMC's trust account."   Payne and Ekstrom repeatedly promised that the proceeds would not leave the escrow account unless the loans were funded, and that if the borrower ever requested their funds back after the 45 days, they would get it immediately. Each of these representations were false. Upon further questioning in October 2020, both Payne and Ekstrom told Mr. Dick that this was safe, and his money would be protected and that if the borrower ever requested their funds back after the 45 days, they would get it immediately. Each of these representations were false.

42.     Progenitor:  Steve Borst

In July or August of 2020, Steve Borst, a principle of Progenitor, met personally with Ekstrom and Payne about finding funds for Progenitor. By the end of September Payne presented Mr. Borst the proposition of finding financing through Alliance. In October 2020, Mr. Borst asked Payne as to whether he knew anyone who had these sorts of funds, and Payne assured Mr. Borst that this was an established funding vehicle, that Payne knew individuals who were successfully funded through Alliance, and also provided the Shurtleff letter that showed the due diligence that was performed on Alliance. Payne and Ekstrom repeatedly promised that the proceeds would not leave the escrow account unless the loans were funded, and that if the borrower ever requested their funds back after the 45 days, they would get it immediately. Each of these representations were false. Upon further questioning in October 2020, both Payne and Ekstrom told Mr. Dick that this was safe, and his

money would be protected and that if the borrower ever requested their funds back after the 45 days, they would get it immediately. Each of these representations were false.

43.    Perfect Order: Forest Baker:

Upon information and belief, Payne began his discussions with Forest Baker, a principle of Perfect Order, in October 2020. During these initial discussions, both Payne and Ekstrom told Mr. Baker that all TallCastle needed to fund the loan was a small origination fee. This origination fee would be held in escrow for a short period, whereafter an entity called Alliance, would then fund the loan. Payne explained that the purpose of the deposit was to "unlock" other funds, and that Perfect Order's funds would remain in escrow until the later of 45 days, or the loan was funded. If no funding occurred, the company would receive their full refund from the escrow, in addition to interest.  In an effort to persuade Mr. Baker,  Payne and Ekstrom presented the Shurtleff Letter, wherein Shurtleff made representations that he had done due diligence on the lending vehicle, and Alliance in particular. In the Shurtleff letter, Shurtleff stated that "it is my legal opinion that business partners, clients and investors can place full faith and trust in transacting business with [Alliance] and DMC's trust account."   Payne and Ekstrom repeatedly promised that the proceeds would not leave the escrow account unless the loans were funded, and that if the borrower ever requested their funds back after the 45 days, they would get it immediately. Each of these representations were false.

44.    Upon information and belief, the Shurtleff Letter was specifically written to distribute to each of the Plaintiffs in an effort to induce them to enter into their respective loan agreements with Tall Castle

45.    The Shurtleff letter, together with the direct communications with Payne and Ekstrom did  induce each of the Plaintiffs to enter into their respective loan agreements with TallCastle.

46.    In each of the individual loan agreements, TallCastle LLC was identified as the lender, and each individual Plaintiff was the borrower.

47.    As part of the consideration for the loan, TallCastle attached a security interest in the equity of the individual companies until the loan was paid in full.

48.    Concurrently executed with the individual loan agreements, the Plaintiffs were required to sign a document entitled *Venture Round Memorandum of Terms* ("Memorandum of Terms").

49.    The parties to the Memorandum of Terms were TallCastle SIF as an Investor, TallCastle Venture Debt as the Lender, the individual Plaintiffs as the Company, and Clarity Partners as an unidentified party.

50.    In the Memorandum of Terms, it explained that in order to obtain the agreed upon loan, each plaintiff was required to pay 10% of the loan origination fee, and many were required to pay a  non-refundable underwriting fee.

51.    The terms of the Memorandum of Terms explains that the "Loan Origination Fee would be held in escrow and refunded in full plus 2.5% if the loan has not funded within 45 days."

52.    Upon information and belief, after each payment by the respective Plaintiff TallCastle and Clarity then issued escrow agreements the "Escrow Agreements" wherein D2D, TallCastle, and Clarity were identified as the "Asset Provider;" Alliance was identified as the Asset Receiver, and DMC through Matta, was the "Escrow Agent".

14

53.     Each of the Parties to the Escrow Agreements knew that these funds belonged to the individual Plaintiffs, and were to be kept separately for their individual loans.

54.     Upon information and belief, each of the Parties to the Escrow Agreements knew that these funds were to be returned to the Plaintiffs if the loans were not funded.

55.     Based on the fiduciary duties of the Escrow agent, the parties knew these funds were to be held in escrow until the triggering event occurred.

56.     Based on the fiduciary duties of the Escrow agent, the parties knew the sole purpose of the IOLTA account was to prohibit the premature distribution of funds.

57.     Based on information and belief, the Escrow agent comingled all of these funds, and distributed these funds to Alliance, which is run by Lipman prior to any of the loans being funded.

58.     Based on information and belief, the Escrow agent did not wait to distribute the funds for the triggering event.

59.     TallCastle—through Payne—promised to return the Plaintiffs' funds.

60.     Somewhere along this process, the funds disappeared, and none of the Defendants claim to know where these proceeds went.

61.     Plaintiffs have attempted to contact each of these defendants. Through this process, Payne, Ekstrom and Shurtleff have all accepted personal liability for the missing funds, but blame DMC, Matta, Lipman and Alliance and D2D.

62.     Shurtleff represented to Plaintiffs that he negotiated a settlement, wherein DMC, Matta, Lipman and Alliance agreed to repay the funds with the contractual penalties.

63.     Upon information and belief, Lipman died before he was able to sign any settlement agreement.

64.    Plaintiffs never received a copy of any of the settlement documents drafted by Shurtleff.

65.    Upon information and belief, some of the funds were distributed back to TallCastle, and TallCastle was going to reimburse the Plaintiffs. Instead, TallCastle, appeared to have kept the funds, likely distributing them to Payne, Ekstrom and Shurtleff.

66.    Shortly after Lipman's death, DMC, Matta, and Alliance stopped communicating with Shurtleff, and shortly after that, Shurtleff and Payne stopped communicating with Plaintiffs.

67.    The loan origination funds paid by the Plaintiffs are still missing.

68.    Upon information and belief, one or more of the Defendants are currently in possession of the funds, or may have transferred them to a third party.

## FIRST CLAIM FOR RELIEF

(Breach of Contract – TallCastle, LLC, TallCastle SIF, TallCastle Venture Debt, and Clarity)

69.    Plaintiffs incorporate herein all other factual allegations of this Complaint.

70.    The Loan Agreements and Memorandum of Terms constitute binding contracts.

71.    Pursuant to the Loan Agreements and Memorandum of Terms, each of the Plaintiffs paid funds to these Defendants to secure the loan, thereby satisfying their contractual obligation.

72.    These Defendants breach the Loan Agreement and the Memorandum of Terms by not refunding the funds plus the penalties once the loans had not funded within 45 days, thereby damaging the Plaintiffs.

73.    Plaintiffs were damaged as a result of the breach in the amount of their respective initial deposits, plus the penalty, plus pre and post-judgment interest.

## SECOND CLAIM FOR RELIEF

(Fraud/Negligent Misrepresentation – TallCastle, Payne, Ekstrom, and Shurtleff)

16

74.     Plaintiffs incorporate herein all other factual allegations of this Complaint.

75.     In connection with the Plaintiffs' investment with TallCastle, Defendants made misrepresentations of presently existing material facts to Plaintiffs as outlined above.

76.     In addition, Defendants omitted to state material facts which they were under a duty to disclose in order to prevent the facts that were stated from being misleading.

77.     The representations of the Defendants were false. In addition, the representations to the Defendants set forth above were false in all respects.

78.     The representations and omissions were made by the Defendants knowingly, or were made recklessly, with knowledge that there was insufficient information upon which to base such representations.

79.     In the alternative, the misrepresentations and omissions were made negligently by Defendants in breach of duties to the Plaintiffs arising from Defendants' superior knowledge of the material facts, from Defendants' pecuniary interest in the transactions at issue, and from Defendants affirmative statements to the Plaintiffs.

80.     Defendants made the misrepresentations and omissions for the purpose of inducing Plaintiffs to act thereon in paying TallCastle the loan origination fees.

81.     Plaintiffs did in fact rely on these  misrepresentations and omissions and were thereby induced to pay TallCastle.

82.     Plaintiffs in all ways acted reasonably and justifiably, in ignorance of the actual truth concealed from them.

83.     By reason of Plaintiffs' reliance on Defendants' misrepresentations and omissions and the payments to TallCastle, Plaintiffs have suffered injury and damage in an amount to be proven at trial.

84.     Plaintiffs are further entitled to a full recovery of pre and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## THIRD CLAIM FOR RELIEF

(Breach of Fiduciary Duty – TallCastle, Payne, Ekstrom, Shurtleff,)

85.     Plaintiffs incorporate herein all other factual allegations of this Complaint.

86.     Defendants owed Plaintiffs a fiduciary duty of care and loyalty due to circumstances of the relationships between the parties including the following:

(a)     Defendants had or held themselves out as having superior skill, knowledge, training, and experience concerning all aspects of the transactions that are the subject matter of this Complaint.

(b)     Defendants expected that Plaintiffs would place particular trust and confidence in Defendants and affirmatively invited and encouraged Plaintiffs to rely upon their judgment and skill with respect to the transactions that are the subject matter of this Complaint.

(e)     Defendants acted as agents of the Plaintiffs in matters concerning the investments of the Plaintiffs.

(f)     Defendants received funds from Plaintiffs which were to be held, managed, and invested for the sole benefit of the Plaintiffs.

(g)     Defendants received substantial compensation from Plaintiffs or from the funds paid by Plaintiffs in connection with Plaintiffs' investments, including funds associated with the receipt and management of the proceeds of Plaintiffs' investments.

87.     Defendants breached their fiduciary duties to the Plaintiffs by conduct including but not limited to the following:

18

(a)    Making the misrepresentations and omissions that are the subject of the Second Claim for Relief.

(b)    Failing to safeguard Plaintiffs' invested funds or otherwise causing or allowing funds paid by the Plaintiffs be diverted for which they were intended and dissipated or used for purposes not benefiting Plaintiffs.

(d)    Charging or receiving excessive commissions, referral fees or compensation, particularly without disclosing to Plaintiffs the basis or amount of their compensation.

(e)    Failing to advise or notify Plaintiffs of the commissions, referral fees, or compensation that they or others would receive in connection with Plaintiffs' investment.

(g)    Failing to conduct sufficient and reasonable due diligence inquiry concerning the investments prior to transferring the investment to other Defendants.

88.    Defendants' breaches of fiduciary duty directly and proximately caused injury to Plaintiffs, for which Plaintiffs are entitled to a judgment awarding damages in an amount to be proven at trial.

89.    Plaintiffs are further entitled to a full recovery of pre and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## **FOURTH CLAIM FOR RELIEF**

(Breach of Fiduciary Duty re Escrowed Funds –
(DMC and Matta)

90.    Plaintiffs incorporate herein all other factual allegations of this Complaint.

91.     Plaintiffs invested their funds with Defendants in order to obtain financing for their respective businesses.

92.     At all relevant times, TallCastle obtained these funds and caused them to be transferred through Clarity and deposited these funds with DMC, wherein Matta acted as the escrow agent. Upon information and belief, these funds were deposited with DMC and in that capacity, DMC and Matta had full and complete control of the escrowed funds.

93.     Plaintiffs were not provided with a separate escrow agreement, but DMC and Matta were obligated to hold each Plaintiffs' funds and return them if the individual loans were not funded.

94.     DMC and Matta breached their fiduciary duty by conduct which allowed the escrowed funds to be disbursed for improper means, as they were not returned to the Plaintiffs despite their multiple requests.

95.     Defendants' defalcation and breach of their fiduciary duty with respect to the invested funds of the Plaintiffs directly and proximately caused injury to Plaintiffs, for which Plaintiffs are entitled to a judgment awarding damages in an amount to be proven at trial, but which may be measured by, among other things, the amount of the Plaintiffs' total investment, together with interest.

96.     Plaintiffs are further entitled to a full recovery of pre and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## FIFTH CLAIM FOR RELIEF

(Conversion – All Defendants)

97.     Plaintiffs incorporate herein all other allegations of this Complaint.

20

98.     Upon information and belief, each of the Defendants may have received a portion or all of the funds contributed by the Plaintiffs' investments.

99.     Upon information and belief, as these funds were bounced from Defendant to Defendant, each Defendant diverted a portion of those funds for purposes other than their known intended purpose, including primarily payments to or for the benefit of the Defendants directly, and upon information and belief, payments to their family members, payments to noteholders, payments of excessive and, and payments of operating expenses.

100.    Said diversion of funds constitutes a conversion of Plaintiffs' property, including but not limited to the funds themselves, Plaintiffs' equitable interest in the benefit of the funds, and Plaintiff's collective interest in application of the funds consistent with the Loan Agreement and Memorandum of Terms.

101.    As a result of the Defendants' conversion of Plaintiffs' property, Plaintiffs have suffered injury for which they are entitled to a judgment in an amount to be proven at trial, but which may be measured by, among other things, the amount of the Plaintiffs' total investment, together with interest.

102.    Plaintiffs are further entitled to a full recovery of pre and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

### SIXTH CLAIM FOR RELIEF

(Federal Securities Fraud Under Section 10(b) of the Securities Exchange Act
and Rule 10b-5 – TallCastle and Clarity)

103.    Plaintiffs incorporate herein all other factual allegations of this Complaint.

104.    As set forth above, Defendants made untrue statements of material facts and omitted to disclose material facts the disclosure of which was necessary to make statements that

were made not misleading.  Plaintiffs specifically incorporate herein all allegations identifying representations by these Defendants as well as all allegations establishing that such representations were materially false.

105.    Defendants' misrepresentations and omissions were made in connection with the loan agreements which constitutes the sale of a security under federal law.

106.    Defendants made the misrepresentations and omissions with scienter, meaning that they knew that their communications included material misrepresentations and omissions or in the alternative, that they acted recklessly and in disregard of obvious or apparent risks that their communications included material misrepresentations and omissions.

107.    Plaintiffs were all purchasers of the investments.

108.    As to Defendants' misrepresentations, Plaintiffs relied thereon when they made their payments to TallCastle; as to Defendants' omissions, Plaintiffs' reliance is presumed because the omitted disclosures concerned matters of material fact that substantially altered the mix of information available to the Plaintiffs.

109.    Defendants' misrepresentations and omissions and Plaintiffs' reliance thereon in purchasing the securities was the direct and proximate cause of injury to Plaintiffs for which Plaintiffs are entitled to a Judgment in an amount to be proven at trial, but which is believed to be at least equal to the amount of Plaintiffs' investment plus interest, less the value of what the Plaintiffs actually received.

110.    Plaintiffs are further entitled to a full recovery of pre and post-judgment interest, costs of court, attorneys' fees where recoverable under contract, at law, or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## SEVENTH CLAIM FOR RELIEF

(Control Person Liability Under the Securities Exchange Act –
Payne, Shurtleff, Ekstrom)

111.    Plaintiffs incorporate herein all other allegations of this Complaint.

112.    The Defendants identified in Plaintiffs' Sixth Claim for Relief above are liable to Plaintiffs under Chapter 2B of Title 15 of the United States Code, the Securities Exchanges Act of 1934, and are referred to in this Claim for Relief as the "Liable Persons."

113.    At all times relevant to this Complaint, the Defendants identified in this Seventh Claim for Relief controlled the Liable Persons, as follows:

(a)    Defendants were officers, directors, or other control people of entities that are Liable Persons.

(b)    Defendants had authority over the Liable Persons as employers, supervisors, or persons with the ability to affect the terms of the Liable Person's employment or livelihood.

(c)    Defendants exercised actual control over the Liable Persons through authority, economic influence, contractual rights, or the use of dominant bargaining power or position.

(d)    The Liable Persons willingly submitted to and complied with the instruction, direction, or authority of Defendants.

114.    With respect to their conduct and control of the Liable Persons relating to the matters addressed in the Ninth Claim for Relief, Defendants did not act in good faith and the acts of Defendants did directly or indirectly induce the acts of the Liable Persons which is the basis for the Sixth Claim for Relief.

115.    Pursuant to Section 20 (a) of the Securities Exchange Act (15 U.S.C. § 78t (a)), Defendants are jointly and severally liable with and to the same extent as the Liable Persons, and Plaintiffs are therefore entitled to a Judgment against Defendants awarding damages in an amount to be proven at trial, but which is the equivalent of any award determined under Plaintiff's Ninth Claim for Relief.

116.    Plaintiffs are further entitled to a full recovery of pre and post-judgment interest, costs of court, attorneys' fees where recoverable under contract, at law, or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## EIGHTH CLAIM FOR RELIEF

(Utah State Law Securities Fraud – TallCastle and Clarity )

117.    Plaintiffs incorporate herein all other factual allegations of this Complaint.

118.    The investments with TallCastle that are the subject of this Complaint are within the definition of securities under applicable provisions of state law.

119.    Under applicable provisions of Utah securities laws,  Defendants were required to fully and fairly disclose all material facts that a reasonable investor would consider important in making investment decisions.

120.    In connection with the Defendants' loan terms, Defendants made untrue statements of material fact; omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or otherwise engaged in conduct that worked fraud or deceit upon the Plaintiffs in violation of applicable provisions of state law.

121.    The Defendants engaged in the conduct violating the applicable laws with knowledge of their failure to make a full and fair disclosure to Plaintiffs.

122.     Plaintiffs did not know that Defendants' misrepresentations were false and were not aware of the material facts that Defendants omitted to disclose in connection with their purchase of securities.

123.     By reason of Defendants' violations of applicable state statutes governing securities fraud, Plaintiffs are entitled to a judgment awarding the applicable statutory remedies, which may be measured by the total amount of Plaintiffs' investment plus interest at applicable rates, less the value of what Plaintiffs actually received from the investment.

124.     Plaintiffs are further entitled to a full recovery of pre and post-judgment interest, costs of court, attorneys' fees as provided in the applicable statutes, and such further relief as the Court may deem appropriate under the circumstances.

## NINTH CLAIM FOR RELIEF

(Unjust Enrichment of Defendants – All Defendants)

125.     Plaintiffs incorporate herein all other factual allegations of this Complaint.

126.     Plaintiffs conferred a benefit on the Defendants by making their initial investment with TallCastle .

127.     Defendants each received a benefit from Plaintiffs in the form of commissions or other compensation or simply some of the funds from the loan deposits paid by the Plaintiffs in what appears to be a perpetuation of an illegal scheme.

128.     Defendants appreciated, acknowledged, or had knowledge of the benefits conferred upon them as they directly received money from the funds or otherwise acted in concert to perpetuate fraudulent loans to obtain and use funds from the Plaintiffs, and divert invested money to purposes not benefiting Plaintiffs.

129.    Under the circumstances, equity and justice demand that Defendants not be permitted to retain the benefits conferred upon them by Plaintiffs without compensating Plaintiffs therefor.

130.    By reason of Defendants' unjust enrichment, Plaintiffs are entitled to a judgment awarding an amount to be determined at trial, but which may be measured by the total amount of benefit that Plaintiffs have conferred upon Defendants.

131.    Plaintiffs are further entitled to a full recovery of pre and post-judgment interest, costs of court, attorneys' fees where recoverable, and such further relief as the Court may deem appropriate under the circumstances.

## PUNITIVE DAMAGES

132.    On each Claim for Relief set forth above, Plaintiffs allege that Defendants' conduct was willful, malicious, intentionally fraudulent, or manifested a knowing and reckless indifference toward and disregard of the rights of the Plaintiffs.  Pursuant to Utah Code Ann. § 78B-8-201 and other applicable law, Plaintiffs are therefore entitled to an award of punitive damages in an amount sufficient to punish the Defendants and to deter similar conduct by others in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against all Defendants awarding the following relief:

1.    On each claim, an award of a full recovery of the funds paid by the Plaintiffs in their as part of their Loan Agreements and Memorandum of Terms, plus consequential damages.

2.      On each Claim for Relief, an award of costs of court; pre and post-judgment interest; attorneys' fees as are recoverable at law, by statute, or by contract; and such further relief as the Court may deem appropriate under the circumstances.

3.      On each Claim for Relief, to the extent that Defendants' conduct is determined to be willful and malicious, intentionally fraudulent, or to manifest a knowing and reckless indifference toward or disregard of the rights of the Plaintiffs, for an award of punitive damages in an amount sufficient to punish the Defendants' behavior and to serve as an appropriate deterrent to others.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial on all claims triable to a jury set forth above.

DATED this 4th day of March, 2022.

**STRONG & HANNI**

/s/ *R. Jesse Davis*
Ryan P. Atkinson
Scarlet R. Smith
R. Jesse Davis
Attorneys for Plaintiffs