THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| VZZR INC., a Delaware corporation, dba in Utah as Publisher Arts, et al., <br><br> Plaintiffs, <br><br> v. <br><br> TALLCASTLE, LLC, a Utah limited liability company, et al., <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER ON [27] DEFENDANTS DMC AND MATTA'S MOTION TO COMPEL ARBITRATION AND MOTION TO DISMISS, GRANTING THE MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION** <br><br> Case No. 2:22-cv-00154-TC-DBP <br><br> Judge Tena Campbell <br> Chief Magistrate Judge Dustin B. Pead |

Before the court is a Motion to Compel Arbitration and Motion to Dismiss filed by Defendants Dodaro, Cambest & Associates, d/b/a Dodaro, Matta, and Cambest ("DMC") and Gary Matta.[1] DMC and Mr. Matta (together, "Movants") request the court compel arbitration in conjunction with Federal Rule of Civil Procedure 12(b)(1), or, in the alternative, dismiss the claims against them under Federal Rule of Civil Procedure 12(b)(2) and 12(b)(6). For the reasons that follow, the court grants the motion to dismiss for lack of personal jurisdiction.

BACKGROUND

As alleged in the complaint,[2] Plaintiffs are limited liability companies and corporations with their principal places of business in Utah.[3] DMC is a Pennsylvania professional company

---

[1] ECF No. 27, filed Sept. 14, 2022.
[2] ECF No. 2, filed Mar. 7, 2022.
[3] Compl. ¶¶ 1–10, ECF No. 2.

1

with its principal place of business located in Allegheny County, Pennsylvania,[4] and Mr. Matta is an individual who resides in Pennsylvania.[5] He is employed by DMC.[6]

The allegations in the complaint focus on the activities of Defendant TallCastle, a private equity company that targets smaller to lower middle market companies for lending opportunities.[7] In 2020, TallCastle, through its principals, began reaching out individually to Plaintiffs, offering them low-interest-rate loans and a network of viable potential investors in their small businesses.[8] For the loan, TallCastle told each of Plaintiffs that they would need to provide a small origination fee.[9] TallCastle informed Plaintiffs that the origination fee would be held in escrow for a short period, whereafter an entity called Alliance Financial Network Inc. ("Alliance") would fund the loan.[10] According to TallCastle, the funds each Plaintiff provided would remain in escrow until the later of 45 days or the loan being funded.[11] If the loan was not funded, Plaintiffs would receive a full refund of the origination fee from the escrow account, in addition to interest.[12] TallCastle repeatedly promised that Plaintiffs' loan origination fees would not leave the escrow account unless Plaintiffs' loans were funded, and that if Plaintiffs ever requested their funds back after the 45 days, they would get them immediately.[13]

As part of its pitch, TallCastle presented a legal opinion from Shurtleff Law Firm, PC.[14] In the letter, Mr. Shurtleff—one of TallCastle's principals—made representations that he had

---

[4] *Id.* ¶ 19.
[5] *Id.* ¶ 20.
[6] *See id.* ¶ 52.
[7] *Id.* ¶ 29.
[8] *Id.* ¶ 34. TallCastle's principals are defendants in this action.
[9] *Id.* ¶¶ 36–43.
[10] *Id.* ¶¶ 22, 36–43. Alliance is a defendant in this action.
[11] *Id.* ¶¶ 36–43.
[12] *Id.*
[13] *Id.*
[14] *Id.*

2

done due diligence on the lending vehicle and on Alliance in particular.[15] Specifically, Mr. Shurtleff opined, "[I]t is my legal opinion that business partners, clients, and investors can place full faith and trust in transacting business with [Alliance] and DMC's trust account."[16]

Induced by TallCastle and Mr. Shurtleff's letter, each Plaintiff entered into a separate loan agreement with TallCastle.[17] In each of the loan agreements, TallCastle was identified as the lender and each individual Plaintiff as the borrower.[18] As part of the consideration for the loan, TallCastle attached a security interest in the equity of the individual Plaintiffs until the loan was paid in full.[19]

Concurrently with the executed loan agreement, each Plaintiff signed a document titled "Venture Round Memorandum of Terms."[20] The memorandum explained that in order to obtain the agreed upon loan, each Plaintiff was required to a loan origination fee.[21] The memorandum stated that the "Loan Origination Fee would be held in escrow and refunded in full plus 2.5% if the loan has not funded within 45 days."[22] The "sole purpose of the [escrow] account was to prohibit the premature distribution of funds."[23]

After each Plaintiff made their Loan Origination Fee payment to TallCastle, TallCastle and Clarity Partners—an unidentified party included in the Memorandum of Terms—issued escrow agreements.[24] The escrow agreements identified D2D, TallCastle, and Clarity Partners as the "Asset Providers" and Alliance as the "Asset Receiver."[25] DMC, through Matta, was the

---

[15] *Id.* ¶¶ 17, 36–43.
[16] *Id.* ¶¶ 36–41, 43; *see id.* ¶ 42.
[17] *Id.* ¶ 45.
[18] *Id.* ¶ 46.
[19] *Id.* ¶ 47.
[20] *Id.* ¶ 48.
[21] *Id.* ¶ 50.
[22] *Id.* ¶ 51.
[23] *Id.* ¶ 56.
[24] *Id.* ¶¶ 15, 52.
[25] *Id.*

"Escrow Agent."[26] Each of the parties to the escrow agreements "knew that these funds belonged to the individual Plaintiffs[] and were to be kept separately for their individual loans."[27] Further, they "knew these funds were be held in escrow until the triggering event occurred" and "that these funds were to be returned to . . . Plaintiffs if the loans were not funded."[28]

However, DMC—the escrow agent—comingled all the funds and distributed them to Alliance before any of the loans were funded.[29] And then "[s]omewhere along this process, the funds disappeared."[30] TallCastle promised to return Plaintiffs' funds, but "blame[d] DMC, Matta, Lipman and Alliance[,] and D2D."[31] TallCastle also told Plaintiffs that it negotiated a settlement "wherein DMC, Matta, Lipman and Alliance agreed to repay the funds with the contractual penalties."[32] Plaintiffs never received a copy of any of the drafted settlement documents.[33] Some of the funds were distributed back to TallCastle but TallCastle kept the funds.[34]

On March 7, 2022, Plaintiffs filed the complaint in this action, alleging breach of contract, fraud/negligent misrepresentation, breach of fiduciary duty, conversion, federal securities fraud and control person liability under the Securities Exchange Act, Utah state law securities fraud, and unjust enrichment.[35] As against Movants, Plaintiffs assert their breach of fiduciary duty, conversion, and unjust enrichment causes of action.[36] On September 14, 2022,

---

[26] *Id.*
[27] *Id.* ¶ 53.
[28] *Id.* ¶¶ 54–55.
[29] *Id.* ¶ 57.
[30] *Id.* ¶ 60.
[31] *Id.* ¶¶ 59, 61.
[32] *Id.* ¶ 62.
[33] *Id.* ¶ 64.
[34] *Id.* ¶ 65.
[35] *Id.* ¶¶ 69–131.
[36] *Id.* ¶¶ 90–102, 125–31.

Movants filed their motion to compel arbitration and motion to dismiss.[37] Movants assert that the escrow agreement at issue contains a binding arbitration clause, and therefore the court lacks subject matter jurisdiction.[38] In the alternative, Movants request the court dismiss Plaintiffs' causes of action asserted against them for failure to state a claim because Movants owed no duty to Plaintiffs and the economic loss rule bars recovery.[39] Finally, Movants argue that the court lacks personal jurisdiction over them.[40]

## DISCUSSION

The court begins and ends its analysis with a discussion of personal jurisdiction. "A court may subject a defendant to judgment only when the defendant has sufficient contacts with the [forum state] 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"[41] "Ordinarily, a plaintiff seeking to establish personal jurisdiction over an out-of-state defendant must show both that the exercise of jurisdiction is sanctioned by the state's long-arm statute and that it comports with the requirements of due process under the Fourteenth Amendment."[42]

> The "minimum contacts" standard may be met in two ways. First, a court may, consistent with due process, assert *specific* jurisdiction over a nonresident defendant "if the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." Where a court's exercise of jurisdiction does not directly arise from a defendant's forum-related activities, the court may nonetheless maintain *general* personal jurisdiction over the defendant based on the defendant's general business contacts with the forum state. However, "[b]ecause general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent

---

[37] Mot. Dismiss, ECF No. 27.
[38] *Id.* at 5–8.
[39] *Id.* at 9–15.
[40] *Id.* at 16–21.
[41] *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 880 (2011) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (cleaned up); *see Benton v. Cameco Corp.*, 375 F.3d 1070, 1075 (10th Cir. 2004) (quoting *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1090–91 (10th Cir. 1998)).
[42] *Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 965 (10th Cir. 2022).

minimum contacts test, requiring the plaintiff to demonstrate the defendant's 'continuous and systematic general business contacts.'"[43]

"The Utah Supreme Court has stated that 'any set of circumstances that satisfies due process will also satisfy the long-arm statute.'"[44] This means that "'the first, statutory, inquiry effectively collapses into the second, constitutional, analysis' of whether personal jurisdiction comports with due process."[45]

"[W]hen the court's jurisdiction is contested, the plaintiff has the burden of proving jurisdiction exists."[46] "The district court is given discretion in determining the procedure to employ in considering a motion to dismiss for lack of jurisdiction."[47] "When a motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written materials, the plaintiff need only make a prima facie showing."[48] "The plaintiff may make this prima facie showing by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the defendant."[49] "The 'well pled facts' of the complaint must be accepted as true if uncontroverted by the defendant's affidavits, and factual disputes at this initial stage must be resolved in the plaintiff's favor when the parties present conflicting affidavits."[50]

Here, Movants submitted a declaration of Mr. Matta as evidence that personal jurisdiction is absent.[51] Plaintiffs did not submit an affidavit or any other materials to their response in

---

[43] *OMI Holdings, Inc.*, 149 F.3d at 1090–91 (first quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); then quoting *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 415 (1984); and then quoting *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996)).
[44] *Pro Axess, Inc. v. Orlux Distribution, Inc.*, 428 F.3d 1270, 1282 (10th Cir. 2005) (quoting *SII MegaDiamond, Inc. v. Am. Superabrasives Corp.*, 969 P.2d 430, 433 (Utah 1998)).
[45] *Eighteen Seventy, LP*, 32 F.4th at 965 (quoting *Anzures v. Flagship Rest. Grp.*, 819 F.3d 1277, 1279 (10th Cir. 2016)).
[46] *Benton*, 375 F.3d at 1074 (quoting *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995)).
[47] *Ten Mile Indus. Park v. W. Plains Serv. Corp.*, 810 F.2d 1518, 1524 (10th Cir. 1987).
[48] *Fed. Deposit Ins. Corp. v. Oaklawn Apartments*, 959 F.2d 170, 174 (10th Cir. 1992) (quoting *Behagen v. Amateur Basketball Ass'n of U.S.A.*, 744 F.2d 731, 733 (10th Cir. 1984)).
[49] *OMI Holdings, Inc.*, 149 F.3d at 1091.
[50] *Fed. Deposit Ins. Corp.*, 959 F.2d at 174; *see also Benton*, 375 F.3d at 1074–75 (quoting *Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1075 (10th Cir. 1995)).
[51] ECF No. 27-3.

opposition, but they object to the court's consideration of Mr. Matta's declaration.[52] Because the court finds that Plaintiffs have not carried their burden even without considering Movants' declaration, the court need not resolve whether it is permissible.

Accordingly, the court analyzes whether Plaintiffs made a prima facie case supporting the court's exercise of specific or general jurisdiction under the Due Process Clause of the federal constitution based on the facts alleged in the complaint.

    A.  The Court Can Not Exercise Specific Personal Jurisdiction over Movants Because Plaintiffs Have Failed to Demonstrate that Minimum Contacts Exist.

"When a controversy is related to or 'arises out of' a defendant's contacts with the forum, the [Supreme] Court has said that a 'relationship among the defendant, the forum, and the litigation' is the essential foundation of in personam jurisdiction."[53] The inquiry into "specific jurisdiction . . . is two-fold."[54] First, the court "must determine whether the defendant has such minimum contacts with the forum state 'that he should reasonably anticipate being haled into court there.'"[55] "Within this inquiry [the court] must determine whether the defendant purposefully directed its activities at residents of the forum, and whether the plaintiff's claim arises out of or results from 'actions by the defendant himself that create a substantial connection with the forum state.'"[56] Second, "if the defendant's actions create sufficient minimum contacts, [the court] must then consider whether the exercise of personal jurisdiction over the defendant offends 'traditional notions of fair play and substantial justice.'"[57] "This latter inquiry requires a determination of whether a district court's exercise of personal jurisdiction over a defendant with

---

[52] Opp'n 27, ECF No. 33.
[53] *Helicopteros*, 466 U.S. at 414 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)).
[54] *OMI Holdings, Inc.*, 149 F.3d at 1091.
[55] *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).
[56] *Id.* (first citing *Burger King Corp.*, 471 U.S. at 472; and then quoting *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 113 (1987)) (internal citation and emphasis removed).
[57] *Id.* (quoting *Asahi Metal Industry Co.*, 480 U.S. at 113).

minimum contacts is 'reasonable' in light of the circumstances surrounding the case."[58] The "reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on [minimum contacts], the less a defendant need show in terms of unreasonableness to defeat jurisdiction."[59]

Plaintiffs argue that this court may exercise specific personal jurisdiction over Movants because (1) Movants "voluntarily participated in a fraudulent scheme involving the loan program focused on Utah's businesses" by "purposely portray[ing] themselves as a trustworthy entity to entice 10 Utah businesses to participate in the loan program"; (2) Movants "provided services in Utah by serving as escrow agents for loans originally invested for in Utah and purposely meant for Utah businesses"; and (3) Movants "caused tortious injury in this state by disbursing the escrow funds to the complete detriment to the Plaintiffs in Utah."[60] As Movants note, many of these arguments are not supported by facts alleged in the complaint.[61] Indeed, Plaintiffs' first argument appears inconsistent with the complaint: Plaintiffs do not assert their cause of action for fraud or negligent misrepresentation against Movants,[62] nor do they allege in their complaint that Movants portrayed DMC as a trustworthy entity—another Defendant purportedly did.[63]

On the other side, Movants argue that there are no grounds for this court's exercise of personal jurisdiction over them because (1) Movants practice law only in Pennsylvania, (2) Movants' only contact with Utah was the escrow agreement which itself is subject to

---

[58] *Id.*
[59] *Id.* at 1092 (quoting *Ticketmaster–New York, Inc. v. Alioto*, 26 F.3d 201, 210 (1st Cir. 1994)).
[60] Opp'n 25, ECF No. 33.
[61] *See* Reply 14, ECF No. 47.
[62] Compl. ¶¶ 74–84, ECF No. 2.
[63] The complaint alleges that one of TallCastle's principals wrote a letter stating that "it is my legal opinion that business partners, clients and investors can place full faith and trust in transacting business with [Alliance] and DMC's trust account." *Id.* ¶¶ 36–41, 43; *see id.* ¶ 42.

Pennsylvania law, (3) Movants did not reach into Utah to solicit business from Plaintiffs or any other Utah company or resident, and (4) the conduct in issue occurred in Pennsylvania.[64]

Because specific personal jurisdiction requires (1) minimum contacts and (2) compliance with traditional notions of fair play and substantial justice, the court analyzes whether Plaintiffs have demonstrated that Movants had sufficient minimum contacts with Utah.

> 1. Plaintiffs Failed to Make a Prima Facie Case That Movants Have Minimum Contacts with Utah Because There Is No Evidence that Movants Purposefully Directed Their Activities at Plaintiffs.

"The minimum contacts test for specific jurisdiction encompasses two distinct requirements: (i) that the defendant must have 'purposefully directed its activities at residents of the forum state,' and (ii) that 'the plaintiff's injuries must arise out of [the] defendant's forum-related activities.'"[65] "The purposeful direction requirement 'ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, . . . or of the unilateral activity of another party or a third person.'"[66] "[W]here the defendant . . . manifestly has availed himself of the privilege of conducting business [in the forum state], and [where] his activities are shielded by 'the benefits and protections' of the forum's laws[,] it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well."[67] "With respect to the second requirement, ensuring the injury arises out of a defendant's forum related activities makes sure an adequate connection exists between the forum and the underlying controversy."[68] "In other words, there must be 'an affiliation between the

---

[64] Mot. Dismiss 19–21, ECF No. 27.
[65] *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 904 (10th Cir. 2017) (quoting *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011)).
[66] *Id.* at 904–05 (quoting *Burger King Corp.*, 471 U.S. at 475).
[67] *Burger King Corp.*, 471 U.S. at 475–76 (first quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 (1984); and then quoting *Travelers Health Ass'n v. Com. of Va. ex rel. State Corp. Comm'n*, 339 U.S. 643, 648 (1950)).
[68] *Dental Dynamics, LLC v. Jolly Dental Grp., LLC*, 946 F.3d 1223, 1229 (10th Cir. 2020).

forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'"[69]

Plaintiffs argue that two purposeful direction frameworks apply: continuing relationships and harmful effects.[70] The court addresses each in turn.

      i. Plaintiffs' Allegations Are Not Sufficient to Satisfy the "Continuing Relationships" Framework Because Movants Did Not Contract with Plaintiffs.

"The typical purposeful direction analysis looks to the out-of-state defendant's 'continuing relationships and obligations with citizens of [the forum state].'"[71] The Supreme Court "ha[s] upheld the assertion of jurisdiction over defendants who have purposefully 'reached out beyond' their State and into another by, for example, entering a contractual relationship that 'envisioned continuing and wide-reaching contacts' in the forum State."[72] "In making this determination, [the court] must evaluate (a) the parties' 'prior negotiations,' (b) their 'contemplated future consequences,' (c) 'the terms of the[ir] contract,' and (d) 'the parties' actual course of dealing.'"[73] If the plaintiff "fails to show that [the defendant] specifically sought to do business, negotiated a contract envisioning significant and long-term obligations, or conducted frequent and regular communications with [the plaintiff]," purposeful direction is not established.[74]

In *Soma Medical International v. Standard Chartered Bank*, the Tenth Circuit "held that an international banking institution that had wrongfully disbursed funds from the . . . plaintiff's

---

[69] *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 262 (2017) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)) (alteration in original).
[70] *See* Opp'n 17, ECF No. 33; *Old Republic*, 877 F.3d at 909 (discussing purposeful direction frameworks).
[71] *Old Republic*, 877 F.3d at 905 (quoting *Burger King Corp.*, 471 U.S. at 473) (alteration in original).
[72] *Id.* (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014)) (alteration in original).
[73] *Id.* at 910 (quoting *Burger King Corp.*, 471 U.S. at 479).
[74] *Id.* at 914.

10

international account did not purposefully direct its activities at the forum state."[75] The court "considered the defendant's following contacts with the forum state: (1) mailing a signature card to the plaintiff in the forum state; (2) sending two letters to the plaintiff's forum state location soliciting signature verification; (3) initiating 14 other written communications with the plaintiff concerning its account; (4) creating an account number for the plaintiff, which acknowledged its forum state address; and (5) creating internal records of the plaintiff's account activities."[76] The court "found these contacts alone insufficient to show purposeful direction for two reasons: (1) based on the record, the plaintiff failed to show that the defendant solicited the plaintiff's business, and (2) the limited number of communications concerning the account did not suffice."[77]

In contrast, the Tenth Circuit found purposeful direction in *Benton v. Cameco Corporation* "based on the out-of-state defendant's joint venture to conduct uranium transactions with the plaintiff."[78] There, "[t]he 'prior negotiations' and the 'contemplated future consequences' of the [joint venture] centered around the continuing relationship between [the defendant] and [the plaintiff]" for two reasons": under the agreement, "the business end of the transactions . . . would take place partially in [the forum state]," and second, there was "evidence that [the defendant] pursued a business relationship with a [forum state] business."[79]

Here, Plaintiffs do not allege that they have a contract with Movants. Plaintiffs do not allege that Movants solicited their business, that Movants and Plaintiffs negotiated, or that Movants and Plaintiffs contemplated future consequences of any agreement. Indeed, the

---

[75] *Id.* at 913 (citing *Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292 (10th Cir. 1999)).
[76] *Id.* (citing *Soma Med. Int'l*, 196 F.3d at 1298).
[77] *Id.* (citing *Soma Med. Int'l*, 196 F.3d at 1299).
[78] *Id.* (citing *Benton*, 375 F.3d at 1073).
[79] *Id.* (citing *Benton*, 375 F.3d at 1077).

11

complaint does not allege any interaction between Plaintiffs and Movants. Instead, Plaintiffs allege that Movants had a contractual relationship with Defendants TallCastle, Clarity Partners, and Alliance—not Plaintiffs. Plaintiffs argue that they are third-party beneficiaries to that contractual relationship, but even so, the complaint does not suggest that Movants had an *ongoing* relationship with any Plaintiffs. It avers that Movants acted as escrow agents for the loan origination fees, with no suggestion that Movants were "envisioning significant and long-term obligations" with Plaintiffs. The complaint also does not suggest that Movants pursued that escrow agreement because Plaintiffs were the third-party beneficiaries or that Movants even knew Plaintiffs were Utah businesses. In summary, there are insufficient allegations that Movants purposefully directed any escrow agreement activities at Plaintiffs in the forum state, and this is clearly insufficient to establish a "continuing relationship" under the purposeful direction prong.

> ii. Plaintiffs' Allegations Are Not Sufficient to Satisfy the Harmful Effects in the Forum State Framework Because Movants Did Not Expressly Aim Their Actions at Utah.

The harmful effects framework has three elements: "(a) an intentional action . . . , that was (b) expressly aimed at the forum state . . . , with (c) knowledge that the brunt of the injury would be felt in the forum state."[80] "A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum."[81] This means that "a defendant's knowledge of a plaintiff's connection to a forum state, without more, cannot establish express aiming towards the forum state."[82] It is likewise "insufficient to rely on a defendant's 'random, fortuitous, or attenuated

---

[80] *Old Republic*, 877 F.3d at 907 (quoting *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1072 (10th Cir. 2008)) (alteration in original).
[81] *Walden*, 571 U.S. at 286.
[82] *Eighteen Seventy, LP*, 32 F.4th at 970 (emphasis omitted).

contacts'"[83] or "mere injury to a forum resident."[84] "In short, . . . the proper lens" is "whether the defendant's actions connect him to the forum."[85] When the allegations are that the defendant "acted with the allegedly tortious intent to disrupt or impair . . . forum-based activities," the defendant has expressly aimed his actions at the forum.[86]

In *Walden v. Fiore*, the Supreme Court considered whether a Nevada court had personal jurisdiction over a police officer who seized the plaintiffs' cash in Georgia, when the officer knew the plaintiffs were residents of Nevada.[87] It was "undisputed that no part of [the officer's] course of conduct occurred in Nevada"; he "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada."[88] While the plaintiffs "suffered the 'injury' caused by [the officer's] allegedly tortious conduct . . . [when] they were residing in the forum," this did "not evince a connection between petitioner and Nevada."[89] Therefore, the Nevada court could not exercise personal jurisdiction over the officer.[90]

Applying this precedent in *Eighteen Seventy, LP v. Jayson*, the Tenth Circuit considered whether a Wyoming court could exercise personal jurisdiction over the CFO of a company ("CRUPE"); CRUPE was based in Singapore and managed in Switzerland, while the CFO was a resident of the U.K.[91] CRUPE's CEO had engaged in discussions with Wyoming business entities about capital investments in CRUPE.[92] The CFO was responsible for gathering

---

[83] *Walden*, 571 U.S. at 286 (quoting *Burger King Corp.*, 471 U.S. at 475).
[84] *Eighteen Seventy, LP*, 32 F.4th at 971 (quoting *Walden*, 571 U.S. at 290).
[85] *Walden*, 571 U.S. at 289 (emphases omitted); *see Eighteen Seventy, LP*, 32 F.4th at 971–72 ("In other words, we have centered the express aiming analysis on whether the defendant's allegedly tortious conduct was focused on or directed at the forum state—not, as the Entities would seemingly have it, on whether the defendant's wrongful conduct was focused on or directed at the interests of plaintiffs who reside in or otherwise have significant connections to the forum state.").
[86] *Eighteen Seventy, LP*, 32 F.4th at 973 (citing *Dudnikov*, 514 F.3d at 1076).
[87] *Walden*, 571 U.S. at 279–80.
[88] *Id.* at 288–89.
[89] *Id.* at 289–90.
[90] *Id.* at 279.
[91] *Eighteen Seventy, LP*, 32 F.4th at 960–61.
[92] *See id.*

information and drafting documents for potential investors.[93] He prepared a confidential memorandum that was emailed to the plaintiffs by his co-worker.[94] Then, the CFO signed a written investment agreement that imposed certain additional duties upon him as a director of CRUPE.[95] The agreement included the plaintiffs' Wyoming addresses.[96] After the agreement was signed, the plaintiffs met with the CFO several times outside of the United States.[97] The meetings convinced the plaintiffs to invest more money in the company.[98] This meant that the CFO "review[ed] and/or sign[ed] documents (including nearly half a dozen contracts) in which [the plaintiffs'] Wyoming address was prominently and repeatedly displayed."[99] In addition to the meetings, the CFO was courtesy copied on several email exchanges with the plaintiffs, and the CFO emailed information about the company's business operation and financials to one of the plaintiffs on a few occasions.[100] The Tenth Circuit found that the CFO's "purported aim was to encourage and induce . . . sustained investments in his foreign company through, in essence, geographically undirected solicitations"; in other words, he was not specifically targeting Wyoming.[101] Further, "there [we]re no averments that the [plaintiffs'] . . . investments had any meaningful connection to their business activities in Wyoming—much less averments permitting a plausible inference that [the CFO] would have been aware of any such Wyoming-CRUPE connections when he committed his tortious acts."[102] Therefore, the court lacked personal jurisdiction over the CFO.[103]

---

[93] *Id.*
[94] *Id.* at 961.
[95] *Id.*
[96] *Id.*
[97] *Id.*
[98] *Id.* at 962.
[99] *Id.* at 971.
[100] *Id.* at 963.
[101] *Id.* at 975–76.
[102] *Id.*
[103] *Id.* at 979–80.

As in *Eighteen Seventy*, Plaintiffs have failed to demonstrate the second element of the harmful effects test: Plaintiffs have not alleged that Movants expressly aimed at Utah, the forum. Here, Movants had even less information about Plaintiffs than the CFO had in *Eighteen Seventy*: there is no allegation that Movants ever interacted with Plaintiffs or that Movants knew Plaintiffs were Utah entities or that the funds in escrow were for their Utah business activities. Accordingly, Plaintiffs cannot satisfy the express aiming element, and that is fatal to their jurisdictional cause.

In their Opposition, Plaintiffs argue that "[Movants] voluntarily participated in a fraudulent scheme involving the loan program focused on Utah's businesses," "[Movants] purposely portrayed themselves as a trustworthy entity to entice 10 Utah businesses to participate in the loan program," and Movants "provided services in Utah by serving as escrow agents for loans originally invested for in Utah and purposely meant for Utah businesses."[104] These broad assertions are not supported by facts as alleged in their complaint. The complaint does not contend that Movants ever solicited Plaintiffs' business—it was TallCastle's principal that allegedly made a representation about Movants to Plaintiffs. The complaint also alleges that Plaintiffs gave their loan origination fees to TallCastle, and then TallCastle placed the fees in escrow with DMC with plans to release them to Alliance.[105] These averments do not suggest that Movants were providing services to Plaintiffs, but to the Asset Providers and Asset Receiver. And, even if Movants were providing services to Plaintiffs, that would be insufficient under *Eighteen Seventy, LP*; Plaintiffs would have to demonstrate that Movants provided services to Plaintiffs because Movants were specifically targeting Utah, rather than providing "geographically undirected solicitations." They have not done this.

---

[104] Opp'n 17, ECF No. 33.
[105] Compl. ¶ 52, ECF No. 2.

15

Plaintiffs have neglected to show a "relationship among the [Movants], the forum, and the litigation." Because Plaintiffs have not demonstrated minimum contacts, they have failed to establish the court's specific personal jurisdiction over Movants.

    B.  The Court Can Not Exercise General Personal Jurisdiction Over Movants Because Movants Are Not "Essentially at Home" in Utah.

"[W]hen the cause of action does not arise out of or relate to the [defendant's] activities in the forum State, due process is not offended by a State's subjecting the [defendant] to its in personam jurisdiction when there are sufficient contacts between the State and the foreign corporation" to create general jurisdiction.[106] "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile."[107] "With respect to a corporation, the place of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction[,]'"[108] "but in an 'exceptional case,' a corporate defendant's operations in another forum 'may be so substantial and of such a nature as to render the corporation at home in that State.'"[109] "[B]ecause general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's 'continuous and systematic general business contacts.'"[110]

*Perkins v. Benguet Consolidated Mining Company* is one of those "exceptional cases."[111] In *Perkins*, the Supreme Court held that an Ohio court could exercise general jurisdiction over a Philippine company when its president, general manager, and principal stockholder moved to Ohio and maintained an Ohio office from which he held "directors' meetings, [maintained]

---

[106] *Helicopteros*, 466 U.S. at 414 (citing *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952)).
[107] *Goodyear*, 564 U.S. at 924.
[108] *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (quoting Brilmayer et al., *A General Look at General Jurisdiction*, 66 TEXAS L. REV. 721, 735 (1988)).
[109] *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 413 (2017) (quoting *Daimler*, 571 U.S. at 139 n.19).
[110] *OMI Holdings, Inc.*, 149 F.3d at 1091 (quoting *Metropolitan Life Ins.*, 84 F.3d at 567).
[111] 342 U.S. 437 (1952).

business correspondence, banking, [and] stock transfers, pa[id] salaries, [and] purchas[ed] machinery."[112] Because of the continuous and systematic nature of these contacts, the Supreme Court found that "Ohio was the corporation's principal, if temporary, place of business."[113]

In contrast, in *Helicopteros Nacionales de Colombia v. Hall*, the Supreme Court found a foreign corporation's contacts with the forum state, Texas, to be insufficient for general jurisdiction.[114] The company's Texas contacts included "sending its chief executive officer to Houston for a contract-negotiation session; accepting into its New York bank account checks drawn on a Houston bank; purchasing helicopters, equipment, and training services from Bell Helicopter [in Fort Worth] for substantial sums; and sending personnel to Bell's facilities in Fort Worth for training."[115] The "company's Texas connections did not resemble the 'continuous and systematic general business contacts . . . found to exist in *Perkins*,'" so the Texas court could not exercise general jurisdiction over the defendant.[116]

Here, Plaintiffs do not allege that DMC had its principal place of business in Utah or that it is incorporated in Utah, so Plaintiffs would have had to allege facts establishing this as an "exceptional case" where DMC's "operations in [Utah] '[are] so substantial and of such a nature as to render the corporation at home in that State.'"[117] However, Plaintiffs do not allege any facts analogous to *Perkins*. According to the complaint, DMC does not hold business meetings, maintain business correspondence, have a bank account, pay salaries, or purchase equipment in Utah, and its partners do not live in Utah. DMC's only alleged Utah business contacts are its communication and contracts with TallCastle and Clarity Partners, the "Asset Providers" in the

---

[112] *Id.* at 445.
[113] *Daimler AG*, 571 U.S. at 130 (quoting *Keeton*, 465 U.S. at 780 n.11).
[114] *Helicopteros*, 466 U.S. at 416.
[115] *Id.*
[116] *Daimler*, 571 U.S. at 131 (quoting *Helicopteros*, 466 U.S. at 416).
[117] *BNSF Ry. Co.*, 581 U.S. at 413 (quoting *Daimler*, 571 U.S. at 139 n.19).

escrow agreements with DMC. These sparse contacts—fewer even than the contacts in *Helicopteros*—are far from establishing "continuous and systematic general business contacts."

In their Opposition, Plaintiffs argue that Movants "marketed to businesses in Utah with the intent to lure Utahns to invest in a fraudulent loan program," "created a relationship with Utahns through promising to keep Plaintiffs' investment money secure until certain conditions were met," and "establish[ed] communications with other Defendants residing in Utah."[118] While these assertions are embellishments on their allegations in the complaint, they still would not establish general jurisdiction. Even if supported by alleged facts, these would demonstrate only a limited business endeavor in Utah. These are not "systematic and continuous" contacts like the defendant had in *Perkins*; there is no allegation that DMC was "essentially at home" in the forum state.

Next, Mr. Matta is an individual. Again, "[f]or an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile."[119] According to the complaint, "Gary Matta . . . is an individual who upon information and belief resides in Allegheny County, Pennsylvania."[120] Plaintiffs do not allege any facts that would support this court finding Mr. Matta is domiciled or essentially at home in Utah. Accordingly, this court cannot exercise general personal jurisdiction over him.

In conclusion, the court cannot maintain general personal jurisdiction over Movants. And because the court does not have either general or specific personal jurisdiction over Movants, Movants would not be bound by any judgment of this court. Therefore, the court does not address Movants' arguments for dismissal under Federal Rules of Procedure 12(b)(1) or (6).

---

[118] Opp'n 18, ECF No. 33.
[119] *Goodyear*, 564 U.S. at 924.
[120] Compl. ¶ 20, ECF No. 2.

**ORDER**

IT IS HEREBY ORDERED that Defendants Dodaro, Matta and Cambest, P.C. and Gary Matta are dismissed for lack of personal jurisdiction.

Signed May 12, 2023.

BY THE COURT

_____
Tena Campbell
United States District Judge